Please be seated. Thank you. Madam President, please call the first base of the afternoon. 114, 37, 45, Kathleen Hagan v. Workers' Comp'n Council, you may proceed. May it please the Court, Council. Good afternoon, Your Honors. My name's Arnold Rubin. I represent Kathleen Hagan, who's the plaintiff appellant in the case before Your Honors today. The single issue before the Court today, although there were many issues presented in the case, is that of a rising out of. On behalf of Arbitrator Hagan, we are going to be requesting that the award, or that the decision of the arbitrator below, the Special Arbitrator Rosen, on behalf of the Commission, that his decision be reversed on the issue of a rising out of, and that the case be remanded to the Commission for further proceedings as it relates to the other issues that were in dispute. The basic facts are not really in dispute here, are they, in terms of the mechanism of the injury, how the fall occurred, position of the desk? That's not in dispute, is it? Justice Hudson, it's true. The great majority of the facts are not in dispute. This case could be decided as a de novo decision based on the fact that the majority of these facts are undisputed. Although quite, to be straightforward, Your Honor, there was a dispute as to whether Arbitrator Hagan was reaching for a file on her desk as she was going to the vault to retrieve a file. Would that make a difference in your opinion? I don't believe so. It's not necessary in this case in order to make a decision regarding the arising out of requirement. The arising out of requirement is the essence of the Workers' Compensation Act. The essence of the requirements that an employee must prove in order to obtain benefits under the Workers' Compensation Act. Is this a neutral risk analysis case? It could be analyzed as a neutral risk case. It could also be analyzed as a case for risk distinctly associated with or incidental with the employment. As the footnote to the Adcock case mentioned, as Justice Stewart and Justice Harris mentioned in that concurring decision, stair cases, and I believe that I'm trying to quote as best as I can without looking at the decision, that Justice Stewart and Justice Harris don't dispute the fact or don't object to the fact that stair cases have been characterized as neutral risk cases. Justice Hudson, I'm not sure this is a stair case. I don't believe it's necessarily a stair case. But if this case could be analyzed as a neutral risk case, we've met the burden of proof to show that we have met the exception to the neutral risk rule. And the neutral... Does it have to be quantitative or qualitative? Both. I think it could be quantitative and qualitative. Quantitative... If it's qualitative, there would have to be a defect, or it wouldn't be a neutral risk. I'm sorry, Justice Hoffman? To be quantitative or qualitative, it would have to be a defect in the riser, or the alternative, it wouldn't be a neutral risk. So it has to be quantitative. That has to be the distinction you have to make. She's required to do this more often than a member of the general public. For it to be a qualitative risk, it could also be that the individual was carrying something that enhanced the risk. Is that true? It's true. To be qualitative, it also could be... And she doesn't specifically state this, but if you glean all the facts together, it could be she was in a hurry to get the file from the vault because she wanted to stop the flow of attorneys into the room. So the inference from two different statements that she made in the record is that she was running around... But the commission didn't draw the inference. The commission did not draw that inference. And it's the commission's job to draw the inference. But you still have an argument based on quantitative. And the quantitative would be the number of times that she's required... She has to get up and down off this riser? Yes. Compared to the number of times the general public has to go over a curb, I think, was what they compared it to. In this case, the state admitted that at least six times per day she's traversing the platform. That's absolutely corrupt. And it certainly would be more, depending on how many cases she would have on a particular day. So the six days would be the minimum amount. In terms of it being... And Justice Hoffman, very respectfully, it could be qualitative risk only... It could be analyzed qualitatively only if it's considered... Having a platform in an office is an inherent risk. So if I'm stepping... If we have a platform that's between these two desks here, and I'm approaching the bench, if I'm not being careful, if I'm being negligent, I may miss a step. Normally, the general public doesn't have platforms in their offices. If the riser was no larger than the riser on the stair in the staircase, how would you be exposed to some risk the general public isn't exposed to? They can see stairs. They can see the rise. Now, if the riser was different in height, that's a different argument. Well, so this riser was eight inches, and the testimony is that there was a similar carpeting on the riser and then on the carpeting below. I don't think you're going to win your case based on qualitative. You may get it on quantitative, but I don't think you're going very far on quantitative. Well, as far as the quantitative aspect of the fact situation that was faced by arbitrator Hagan on February 13, 2008, it is unrebutted that a number of times she would be traversing the riser. There was this flurry of activity in the room, which is undisputed. So the case law, then, would be supportive of this finding regarding the arising out of, using the Cimella v. Vanna case, which discusses the flurry of activity in the parking lot. I might also add that the Nascot case, where the individual, it was analyzed, as Justice Hoffman points out, on a quantitative basis. In that particular case, the platform that the worker was using was actually less than the platform, or the height was lower. It was four to six inches. In that case, it was eight inches in this case. And based on the number of times the person was using that on a quantitative analysis, that satisfied the exception to the general rule relating to neutral risks, and it was determined that the risk was greater to the worker than the general public, just as in arbitrator Hagan's case. Her risk of traversing this platform was greater than the general public. Let me ask you this. The special arbitrator found or suggested there were some problems with her credibility because he did not believe that she was reaching for a file. So is that sort of a red herring for us, whether she's reaching for a file? Is that really relevant here? You don't need her to be reaching for a file to rule in favor of arbitrator Hagan, as I stated in my closing argument before arbitrator Rosen. And he asked me a specific question, and I'm going to answer it exactly the same way today, which is no, she doesn't have to be reaching for the file for this to be a compensable case and qualify under the arising out of requirement either as neutral risk or if the court so chose to review it as a risk distinctly associated with her employment, and that would be my alternative argument, that we have a situation where we have this platform in an office and it's distinct to her and the configuration of the room is such that she had a very narrow opening for ingress and egress. But with respect to the basis for which this court could find in favor of arbitrator Hagan, based on the facts and analyzing this as a neutral risk case, we would then submit that yes, as a neutral risk case, this would qualify as an exception to that rule, that neutral risk would not be compensable because it's a risk that the arbitrator faced that was greater than the general public on a quantitative basis. When did you first raise the quantitative basis argument? In terms of the number of times? Specifically, I don't know that it was specifically addressed. Inherently it was addressed in my argument before the arbitrator and her briefs that there was a flurry of activity in the room and that she had to go to the vault to retrieve the files. The state argued that we didn't show how many times she had to do it on that particular day and so it came down to their admission that it was probably at least six times per day. They conceded that in their brief. It was at least six times per day, at least ten days per month, right? They conceded that. But my question is on appeal. Where did you raise the quantitative argument? Wasn't that in your reply brief? Specifically, they would probably be correct. Inherently, it wasn't specifically raised until then. They would be correct. Can you do that? Can you raise an argument for the first time in a reply brief? In terms of the specific argument, I had always been discussing this case in terms of the arising out of requirement. Then under arising out of, we get into the analysis of what kind of risk is involved. Is it risk distinctly associated with the employment? Is it going to be a neutral risk case? So we took the position, actually we argued alternatively, that it was a risk that was distinctly associated with the employment. We argued, we cited all the cases relating to neutral risk under arising out of. But if you're asking me do we specifically state quantitative, no. But I don't know that we weigh that by not specifically stating that. When I read through your client's brief, I saw that you raised the argument that it was a risk distinctly associated with her employment. And then in the alternative, that it was a neutral risk, but her risk was enhanced over that of the general public from a qualitative standpoint, arguing the configuration of the hearing room, the tight space between the desk and the wall or the bookcase and the wall, it being an eight-inch platform, which I wasn't quite sure in answer to Justice Hoffman's question if you were claiming that was a defect in and of itself. And then fourth, as I went through it, you identified the necessity that she had to use the riser for access. But they were limited to the qualitative aspects of the neutral risk analysis. I didn't see anything about the quantitative aspect. In terms of specifically referencing the number of times it wasn't there, you're correct. It's correct. Let me direct you to the configuration argument. If I understand it, upon the riser is a witness chair, is that correct? Yes. And also a reporter's chair? Yes. And they're to the left of the arbitrator? Yes. And to the right of the arbitrator's file cabinet in that narrow opening, is that correct? Right. It's her desk or her file. Yes. It was a desk. It was a bookcase. It was a bookcase. For capital egress and egress, the arbitrator takes both files. Yes. On the riser platform where the witness and reporter sit, is it correct in my reading that there is a tape marking in that riser? Yes. There was tape, and that went to the qualitative argument or qualitative aspect of the risk. This arbitrator, Hagen, testified unrebutted that when the arbitrators moved into the hearing rooms or when the platforms were put in the rooms, witnesses were stumbling as they were approaching or as they would step up to testify. So this arbitrator, Hagen, and other arbitrators put down white tape on the floor to alert witnesses that there was a rise and so that they wouldn't trip. So that went to the argument I think that Justice McHarris was referencing where we took the position that it was an inherently dangerous situation. Is the carpet on the floor and the carpet on the riser the same? Yes. Her testimony was it was similar carpet. There's a specific statement in the record on that. Similar color and texture? Justice Holdridge, I didn't go into more questioning of her on that. She just said similar. Her statement was similar carpet. And although in the Nabisco case, the court stated that the carrying of the knives was inherently a risk. Having this platform in the alternative argument that we have is that the platform in the room was an inherently dangerous situation that increased the risk of injury for her. So what impact, if any, does our recent decision in ADCOC have on the merits of your position? The ADCOC case can be used to actually, it supports our decision because it's a neutral risk analysis case. So in my opinion, the finding in ADCOC would be consistent with a finding in favor of the arbitrator here that the, if you analyze it as a neutral risk case, that the specific risks that arbitrator Hagen faced on February 13, 2008 in connection with her courtroom, those were risks that were increased risk to her as compared to the general public. And as it relates to the arbitrator's analysis regarding the general public, so the arbitrator mentioned that the general public would include other witnesses or other arbitrators. And actually, the court has actually stated previously that that's not how you would characterize the general public. So in the IIT Research Institute case, this court said that the claimant's risk is to be compared with the broad cross-section of the public. So it's not that there were other arbitrators at the commission that he had the riser. It wasn't that the witnesses as members of the general public would have access to that. It's the general public, the broad cross-section. And I submit that the broad cross-section of the general public do not have eight-foot platforms in their home offices or dens or kitchens or other rooms where they would be stepping down with a three-foot narrow area for ingress and egress. You've also maintained that the commissioner is not awarding TTD criminal total medical expenses. If the court were to rule in your favor, that would necessitate a remand. Yes. For the commission to rule, correct? Yes. Okay. Yes, that would be our prayer for relief. I thank Your Honors for the time allotted for me today to provide this argument on behalf of Kathleen Hagan. And we do request the reversal and remand as outlined by Your Honor, by Justice Hudson. Thank you very much. You have time to reply. Thank you. Counsel, you may respond. Good afternoon, Your Honors. Counsel, may it please the court, my name is Mary Labreck. I am an assistant attorney general here representing the Illinois Workers' Compensation Commission. Because the court did a lot of my work for me in the Adcock case, I will go directly to discuss the quantitative and qualitative arguments that counsel was making. We don't believe that any of these quantitative and qualitative arguments justify considering her to have faced a risk greater than the public generally faces. No, I'm not saying that there was no risk at all. In taking that step, there was a slight risk over what she would have faced, slight risk over zero, slight risk that she would have faced over a flat floor. Similarly, perhaps, in negotiating the three-foot opening, there was a slightly increased risk more than she would have faced going in a wide open area. But that's not the test. The test is not whether there's a little bit of risk over some other state of affairs. It's whether the public generally, most people at most times, faces a greater risk. And that just can't be said in this case. The public has negotiated this very narrow opening and stepped down off the riser more than she does or equal to what she does on a regular basis. The public doesn't face the exact same situation, but the public faces steps all the time in all kinds of different situations, steps onto buses, steps onto plazas, curbs. Are they also in this very narrow configuration? Wasn't it just like a three-foot gap? Wasn't it a very tiny space that she had to negotiate? Well, she didn't give any facts to suggest that this three-foot obstacle, I mean, these three-foot gaps presented a particular difficulty. But the public does face similar difficulties all the time in going on a wide staircase, avoiding other people in negotiating steps. As many times a day as she does? We said a minimum of six. She didn't testify to anything more. She gave us nothing on which this court could say, yes, this is a really elevated risk. So the question becomes, this is a failure of proof, is your argument? She failed to prove how many times a day the public is exposed to a similar risk, and therefore she cannot prove that she was exposed to the risk more times than the general public would be exposed to the risk. Well, you could say that, but I don't think it's really just a failure of proof. I really think that were she to prove her facts honestly, there's no way that she could have shown that there was a greater risk in this case. And she did say in her opening brief that she regularly traverses, and so that's some small number. However, the Illinois Supreme Court in the Caterpillar case rejected the idea that regularly traversing the curb, some minimum number, we don't know how many, was sufficient in that case. It's less than negotiating to and from three curbs a day. It's less than half a set of stairs. But they were looking at curbs that the public is generally exposed to, is that correct? That's right. And is the public generally exposed in offices to risers? Well, but the test is not whether it's exposed in offices. The test is whether it is exposed in general to the specific risk that she faced, which was a risk of a step up. And the offices might be relevant if there were some issue that she may have been surprised, not expecting to find this in an office environment. But that can't be said. This was her room. She'd had it for a number of years. She knew that there were risers in this room. Well, from a qualitative standpoint, the opposing counsel in his brief indicated that these additional aspects played into the fall, the configuration of the room, the narrow space, it being an 8-inch platform. What was the evidence as to how the fall occurred? What contributed to cause the fall? There was no specific evidence about how. She did not describe how the configuration played into it in any way. That was an extremely vague allegation. She said that it was a narrow space, but in her testimony, she never suggested how that narrow space impacted her. And that narrow space is, you know, the size, less than the size of a, or greater than the size of the average bedroom door or lots of other doorways that the public faces all the time. And she didn't, you know, and she also, she said she twisted when she was reaching for the file. Even if you credit that, she said she twisted a little bit. It was right by her desk. She reached a little bit. There's just nothing in this case that takes it into an extraordinary realm. This is, you know, about as close as you can get to stumbling over your own feet. Yes, there was a step. There was an 8-inch step, the same height as the curb. She doesn't suggest it was an extraordinary height for a step or a stair, you know, on a staircase or outside of a staircase. And I believe it was. You can't ignore the very narrow gap that you had to traverse. You know, when you're talking about people and referring to stepping off a curb, yes, it's a legitimate point, but are people twisting their body in a 3-foot gap when they step off curbs outside? If they're in the crowds, when there are a lot of people trying to cross the curbs, when there are a lot of people on a staircase, when someone's going through a step that leads to a doorway in a building, there are lots of circumstances in which someone faces that same problem. The one thing I find intriguing, we talk about a risk that the general public is exposed to more frequently than the claimant. Do you have anything in the record that establishes the general public's, you know, encountering the same risk that she encountered? No. You're saying the general public encounters the same risk, you know, but do we know that in the record, how many times they would be exposed? Her burden is to prove that she has a greater risk than the public faced. She testified to how many times she traversed the stairs, this riser, in a day, right? I'm sorry? Her testimony was unrebutted. Was it not essentially as to how many times a day she did this? She really didn't testify as to how many times a day. She said she, you know, she has to cross it to and from. I gave her six steps in my analysis because I imagined she must have at least done it twice a day because she had to come in in the morning and leave in the afternoon, and she had to go and come from lunch, and then she said that she went to the vault to get, so I said that there must have been at least six. Six times a day, ten days a month, right? That was your, you conceded to that part. Yes. So we're comparing this against what? We're comparing this against what most people face at most times, and I think... How often does the member of the general public face a riser, be it a curve or anything else, on a daily basis? I don't know exactly, but I... So then I'm back to my same question. Is it a failure of proof? Well, it is a failure of proof in the sense that... It's a real softball I'm giving you. Yeah, it is a failure of proof in the sense... I mean, I don't think she could have proved it. I think we have a kind of... Why not? Well, because I think if there was an extraordinary number that she traversed or if there was anything extraordinary about this situation, she would have mentioned it. It would not have escaped her notice. So I think, you know, this... So... But she did... There is a failure of proof in that she failed to prove what she needed to prove to show that she was eligible for benefits. Is that... But you're not telling us why she didn't prove that she was required to prove. She didn't prove that she faced any risk that was greater than the risk that the public faces. Well, that would necessarily mean she'd have to tell us what risk the public faced and how frequently they faced it if it's a quantitative distinction, wouldn't it? That's right. Yeah, no, I'm not disagreeing with that. I just did not want to suggest that there was some information out there that if she'd only brought it forward would have, you know, justified a different result. I don't think that information exists. But that is what she would have had to do to prevail. Okay. Have you addressed the qualitative aspect of that? I was doing... Well, part of those... Part of what I said was qualitative. I think the gap is qualitative. There's also the issue that she alleges that she was rushing, which is part of it. But, again, I don't think there's anything extraordinary here. I mean, she... She was in charge of the courtroom. It's not like they were going to start before she got back. There were no facts that suggest that there was any urgency for her to get to the courtroom at that time. Nothing that suggests that she was placed in a state of alarm or stress that should have raised her level over the level that the public generally faces. And... Yeah, and I think... And also reaching for the file is the only thing she says. But that, again, is a... Even if you credit that, which the arbitrator did not, that is a negligible risk because the file was not something that unbalanced her. It was a couple ounces. It was not something that got in the way of her visibility. It was not something that increased the danger if she fell. So, from that standpoint, we completely agree with her that it doesn't matter whether or not she was holding the file. The result is still the same. That there's no risk greater than... That she demonstrated no risk greater than the public has to face. I'm going to ask about the configuration of the riser. It's my understanding that the riser on the side that she was using, okay, is not taped. But, perhaps more importantly, there's a wall just, what, three feet away from that edge? Right. Yes. It forms a little hallway to go out to go to a vault to get files. Right. That was the three-foot gap I was referring to. And that's the three-foot gap that is nothing extraordinary either. It doesn't strike you as narrow? Narrow for... I mean, it does not strike me as something that would make it difficult to get through. I guess I'm somewhat asking the same question indirectly that Justice Hudson is asking. You're walking towards a wall, is that correct, as you're leaving the riser? Well, the desk and the bookcase and the wall are right there. So, a little bit, like a step or two, and then you go out. Well, you have to step off. When you step off, you're stepping toward a wall, though, are you not? No, you're standing, as I understand it, you're standing beside the wall and you're stepping down. So you're standing roughly between the wall and the bookcase, and then you're stepping down there. Because, she says, the bookcase was right up to the edge of the riser. Okay. And I'd just like to say a couple of things really quick about the errors in plaintiff's argument about distinctly associated. There are two things that are causing the problem in this analysis, I believe. And the first one is that she has misstated the test for distinctly associated and also neutral risks. We don't begin with a neutral risk and begin looking for bodily movements, as she suggests. The way that we apply that test is we look at, we look for risks that are distinctly associated, that is risks that the public generally does not face outside the employment context. And then we look to see if there's a personal risk. If there are no risks that are either personal or distinctly associated, then we know that we're in the neutral risk category. And this is the way that Larson's talks about distinctly associated risks and neutral risks. And the case law also talks about this. There are situations in which a neutral risk is unrelated to the employment, and that's like acts of God, mad dog bites, and so forth. But there are also cases in which it might or might not be. Those are the unexplained cases. And then there are cases that are clearly related, such as the stairs cases in Nabisco in Baldwin and also the curve case in Caterpillar. And the distinctly associated risk is the definition there, as it says in Larson's, is historically associated with industrial injuries. And it has broadened since then, but not as broad as she would like it to be. The Shmulek case says that even if something is peculiar to the work, it still has to be something that the public does not face. And also, as Your Honor suggested, in Adcock, it will collapse the distinction between in the course of and arising out of, because the same test, whether the actions were incidental to the employment, will be serving for both rules. And the second source of error is that the test for causation is increased risk. And we don't usually apply an increased risk test expressly when we find that a risk is distinctly associated with the employment. But there are four reasons that this is so, and the Illinois Supreme Court has expressly said so, is one. In the Campbell case, they said that Illinois adheres to the general requirement that one's employment must subject him to an increased risk beyond that to which the general public is suggested. And again, the act is intended to compensate only for those injuries, the risk of which is increased by the employment. And another similar statement in Orsini and in Caterpillar itself, which said that an injury, that said that this court is not prepared to adopt the position that an injury could be compensable regardless of whether the conditions or nature of the employment increased or contributed to the risk which led to the injury. And that idea makes sense. We principally rely on- Your time is up. I'm sorry. Thank you. I'm sorry. For the remaining issues, we stand on our brief. For the reasons brought forward in this argument and in our brief, we urge this court to affirm the circuit court's judgment, thereby upholding the commission's determination that the plaintiff is eligible for unemployment benefits. Thank you, counsel. Counsel, you may reply. Thank you. Your Honor, just a couple of points, and I have, I assume, just a few minutes. Five minutes. Five minutes, right. Yes. Counsel stated that arbitrator Hagen was exposed to slight risk. So she's admitted, I think it's a significant risk, but she's admitting that we have, in this situation, the way her courtroom was, that there were risks of the employment. Now, I submit that we established that there were risks greater than the general public. How did we establish they were greater than the general public? Well, I didn't go through and discuss, in general, have architects are brought in to talk about whether or not particular offices have platforms in them, but I did ask some questions on direct examination of the arbitrator that talked about the configuration of the other rooms at the commission. The only rooms at the commission on the eighth floor that had these platforms were the hearing rooms. The arbitrator's regular offices didn't have a hearing room. The chairman's office didn't have a hearing room. The arbitrator's offices didn't have a platform. The chairman's office didn't have a platform. So the only platforms were in these hearing rooms. Is there a photograph or a diagram in the record? I didn't put that in, and in retrospect, it's probably something that should have been put in. The hearing was before, it was in a room very similar to the arbitrator's room, and so the arbitrator rose when he was hearing the case. I asked him, or the arbitrator established that this was the same type of basic room. But no, there is no picture. It's just a description. I don't need to bring in anything outside the record here, but just does the record establish that the arbitrator's desk was situated in front of her here, and then to the right of the desk kind of a continuation of that flat plane was a bookcase? Yes. That then led to the edge of the riser. So it went parallel to the wall, that configuration of desk and bookcase. So to her right, like if this was her desk, the testimony is that she had a bookcase. She moved the bookcase. The bookcase originally was on this wall, but for her security because she had been attacked by some clans, she wanted to create almost like a fortress type setting, so she moved the bookcase over to her desk. So now the only opening to get down and get out of her courtroom was to step over, and this is where the three-foot opening was between the end of the bookcase and the wall. And then once she stepped down off the platform, which went up to her desk, because her desk was on the platform, so her desk ended the platform and that's where she stepped down. So her step down was to the front, not to the side of her desk. Her step down is on the side of her desk, on the side of the bookcase, going to the front of the room. And she stated she lost her balance. That's in the record. She lost her balance. Did she say, and she said she was looking down. So those are the facts of the accident. Those are the facts of what happened on that particular day. And three feet between the end of the bookcase and the wall? Three feet between the end of the bookcase, yes, and the wall. That's the opening. She said approximately two to three feet. Her reaction testimony, it wasn't tiny, but it wasn't very big. That's exactly what she said. It wasn't tiny, but it wasn't a very big opening. And that's what she used to ingress and egress during the course of the day. Did the size of the opening contribute to the fall? It's not. The size of the opening created an additional risk. Did the risk then come to fruition where it caused her fall? Lots of things can create risk, but they don't necessarily then result in what the risk poses. So did this risk you're saying was posed by a narrow opening contribute to cause her fall? Was there evidence of that? There's nothing specifically that states that. There's nothing that specifically states that. Again, the overall configuration of the room, and the record talks about the losing of balance and looking down and then the similar type of carpeting between the eight-inch platform and the carpeting below. If it's appropriate, I did look at my brief in terms of one of the questions you asked me. On page 20 of our brief, when we were talking about the unusual risks, we did talk about the necessity that she regularly traversed the riser to access and depart from her desk, supplied by the employer. So I suppose that could fit into the quantitative numbers. That's what that would apply to. We didn't give a numeric number, but you said. We did not give a numeric number. You addressed the quantitative portion. Yes. Very good. Your time has expired on the floor. Thank you very much. Thank you, Counsel Ball, for your arguments in this matter this afternoon. It will be taken under advisement. A written disposition shall issue.